SKAPIK LAW GROUP
Mark J. Skapik (SBN 164957)
Geralyn L. Skapik (SBN 145055)
Blair J. Berkley (SBN 222293)
Matthew T. Falkenstein (SBN 333302)
5861 Pine Avenue, Suite A-1
Chino Hills, California 91709
Telephone:   (909) 398-4404
Facsimile:   (909) 398-1883
Email: mskapik@skapiklaw.com, gskapik@skapiklaw.com,
bberkley@skapiklaw.com, mfalkenstein@skapiklaw.com

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| DAMON "DAVID" WOOD, an individual, and on behalf of all persons similarly situated,<br><br>     Plaintiffs,<br><br>  vs.<br><br>CITY OF SAN BERNARDINO, a municipal corporation; and DOES 1 through 4, inclusive,<br><br>     Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. 42 U.S.C. § 1983 (Unreasonable seizure)<br>2. 42 U.S.C. § 1983 (Excessive force)<br>3. 42 U.S.C. § 1983 (Monell)<br>4. Civil Code § 51.7 (Ralph Act)<br>5. Battery by law-enforcement officer<br><br>**DEMAND FOR JURY TRIAL** |

///

///

Plaintiff DAMON "DAVID" WOOD ("Plaintiff") alleges as follows:

1.    Plaintiff is an individual and resident of the City of San Bernardino.

2.    Defendant CITY OF SAN BERNARDINO ("CITY") is a municipal corporation organized and existing under the CITY Charter adopted by voters on November 8, 2016.

3.    Defendant DOES 1 through 4 are police officers in the CITY Police Department. The true names of Defendant DOES 1 through 4 are unknown to Plaintiff who, therefore, sues these Defendants by such fictitious names. When the true names of these Defendants are ascertained, Plaintiff will amend this Complaint to allege their true names.

## JURISDICTION AND VENUE

4.    This Court has original jurisdiction over Plaintiff's 42 U.S.C. section 1983 claims pursuant to 28 U.S.C. sections 1331 and 1343. The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. section 1367.

5.    Venue is proper in the Central District of California, Eastern Division, under 28 U.S.C. section 1391(b) because Plaintiff's claims arise out of the acts of the CITY police officers.

## PRESENTATION OF WRITTEN CLAIM

6.    On October 5, 2022, in compliance with California *Government Code* section 905, Plaintiff presented to CITY a written claim for damages arising out of his arrest on April 18, 2022.

7.    On October 6, 2022, Samantha Morgan, a claims adjuster for George Hills wrote to acknowledge receipt of the claim. Ms. Morgan's letter states, "You will be advised in writing of the City's decision after our investigation."

8.    As of the filing date of this Complaint, Plaintiff's counsel has received no other communication from the CITY or George Hills.

///

///

## GENERAL ALLEGATIONS

9.     On April 18, 2022, Plaintiff was in his apartment located at 2641 West 2nd Street, Apartment 5, San Bernardino, California 92410 with his step-granddaughter (Genesis) (age 14).

10.     Plaintiff lived in the apartment with his wife (Victoria) and Genesis.

11.     Victoria was not at home, and Plaintiff believed that she was out with her male friend.

12.     Plaintiff asked Genesis where her grandmother (Victoria) was. (Genesis was in her bedroom.) Genesis denied that she knew where Victoria was, and Plaintiff did not believe her.

13.     Plaintiff was perturbed that Victoria was (again) out with another man, and that Genesis would not confirm it.

14.     Plaintiff exited Genesis's bedroom and shut her door. When the door was shut, Plaintiff (out of frustration) hit the outside of the door with the side of his hand. Plaintiff is informed and believes that the loud noise scared Genesis.

15.     Plaintiff commenced watching a Los Angeles Dodger's game on the television.

16.     At some point, before the 7th inning of the baseball game, Victoria returned to the apartment and went into her bedroom.

17.     Plaintiff is informed and believes and thereon alleges that, when Victoria returned to the apartment, she talked to Genesis and called the police.

18.     During the 7th inning of the baseball game, Plaintiff went outside the front doorway to smoke a cigarette.

19.     Plaintiff was wearing only shorts (no shirt), and there was nothing in his pockets. There were no bulges in his shorts.

20.     While standing in the doorway of his apartment, approximately two hours after his conversation with Genesis, Plaintiff observed four police officers from the San Bernardino Police Department, Defendant DOES 1-4, arriving at his apartment

complex. Plaintiff did not feel threatened because the officers looked like *Keystone Cops* and appeared confused.

21.    Plaintiff is informed and believes that Defendant DOE 1 is known as "Caine." DOE 1 is a white male.

22.    Plaintiff is informed and believes that Defendant DOE 2 is a rookie male police officer. DOE 2 appears to be Hispanic.

23.    DOE 3 is a white male who appeared to be the supervisor of the group who came to Plaintiff's apartment.

24.    DOE 4 is a tall white male with a mustache.

25.    DOES 1-4 knew that Plaintiff suffers from schizophrenia, bipolar disorder, and post-traumatic stress syndrome (PTSD) because these conditions are documented in Plaintiff's criminal record.

26.    All police officers in the State of California are required to be Peace Officer Standards and Training ("P.O.S.T.") certified. Training for dealing with mentally-ill individuals is mandatory and covered in P.O.S.T. Learning Domain 37 ("LD 37"). P.O.S.T. LD 37 instructs police officers: "Do not threaten the individual with arrest or in any other manner" because "[t]hreats may create additional fright, stress, or potential aggression." LD 37 (p. 4-16).

27.    Defendant officers DOES 1-4 arrived to Apartment 5 and initiated a causal conversation with Plaintiff. Plaintiff was 4 or 5 feet inside the front door of Apartment 5 (leaning on a sofa armrest) and DOES 1-4 were outside.

28.    DOE 3 ultimately asked Plaintiff if "Daniel" was in. Plaintiff responded that no "Daniel" lived in the apartment. Then DOE 3 asked if "Jennifer" was in. Plaintiff responded that no "Jennifer" lived in the apartment.

29.    Then DOE 3 responded, "We're coming in."

30.    Plaintiff responded that, "You are not coming in without a warrant."

31.    DOE 3 yelled, "Take your hands out of your pockets."

32.    Plaintiff's hands were not in his pockets and there was obviously nothing in his pockets.

33.    Almost simultaneous with Plaintiff stating, "You are not coming in without a warrant," and DOE 3 yelling, "Take your hands out of your pockets," DOES 1-3 charged into the apartment, grabbed Plaintiff, dragged him outside the apartment, threw him up against the exterior wall of the apartment building, and twisted his arms behind his back.  Plaintiff loudly objected to the unconstitutional seizure and excessive force.

34.    DOES 1-3 arrested Plaintiff for resisting arrest (*Penal Code* § 69(a)).  DOE 1 handcuffed Plaintiff with his hands behind his back and sat Plaintiff on the outdoor stairs near Apartment 5.

35.    Plaintiff continued to voice loud objections to DOE 1 and 2's excessive force and arrest without probable cause.

36.    DOE 1 grabbed Plaintiff by the left arm, stood him up, and then threw him down on the concrete walkway (face down).

37.    As a result of the impact on the sidewalk, Plaintiff suffered three broken ribs, a fractured elbow, and a collapsed lung.

38.    DOE 1 put his knee on Plaintiff's back to hold him down while DOE 2 held Plaintiff's head down in the dirt next to the walkway.  Plaintiff had great difficulty breathing.

39.    Officer DOES 1 and 2 took Plaintiff to Arrowhead Regional Medical Center ("Arrowhead") for examination and treatment.  A nurse measured Plaintiff's blood pressure and temperature and discharged him. No treatment was provided.

40.    Following the examination, Officers DOES 1 and 2 took Plaintiff to the County of San Bernardino ("County") Central Detention Center in San Bernardino. The County isolated Plaintiff pursuant to its policies for holding inmates with mental illness. Plaintiff laid on the floor for a day or so because he could not breathe.

41.    On or about April 19, 2022, Plaintiff was transferred to the West Valley Detention Center ("WVDC") in Rancho Cucamonga.  The County isolated Plaintiff

1  pursuant to its policies for holding inmates with mental illness. Plaintiff laid on the floor

2  for a day or so because he could not breathe.

3       42.    Plaintiff spent approximately three days in isolation lying on the floor with

4  three broken ribs, a fractured elbow, and a collapsed lung.

5       43.    Finally, on or about April 21, 2022, a female custody officer found Plaintiff

6  lying on the floor and asked if he was all right.  Plaintiff responded that he could not

7  breathe.

8       44.    The female custody officer took Plaintiff to Arrowhead for another

9  examination.

10      45.    X-rays revealed a collapsed lung, three broken ribs, and a fractured elbow.

11  Plaintiff underwent surgery to inflate his lung and to treat his fractures.  Plaintiff was

12  discharged from Arrowhead on or about April 22, 2022.

13      46.    On or after his return to WVDC, Plaintiff was moved into the general

14  population.

15      47.    On or about April 28, 2022, Plaintiff appeared (via video) for arraignment

16  and was released on his own recognizance.

17                                           **I.**

18                              **FIRST CAUSE OF ACTION**

19     **VIOLATION OF FOURTH AMENDMENT—UNREASONABLE SEIZURE**

20                                  **[42 U.S.C. § 1983]**

21                          (By Plaintiff Against DOES 1-3)

22      48.    Plaintiff incorporates by reference the allegations contained in paragraphs

23  1-5 and 9-47 as though fully set forth herein.

24      49.    On April 18, 2022, Plaintiff was in his apartment located at 2641 West 2nd

25  Street, Apartment 5, San Bernardino, California 92410 with his step-granddaughter

26  (Genesis) (age 14).

27      50.    Plaintiff lived in the apartment with his wife (Victoria) and Genesis.

28

51.    Victoria was not at home, and Plaintiff believed that she was out with her male friend.

52.    Plaintiff asked Genesis where her grandmother (Victoria) was.  (Genesis was in her bedroom.) Genesis denied that she knew where Victoria was, and Plaintiff did not believe her.

53.    Plaintiff was perturbed that Victoria was (again) out with another man, and that Genesis would not confirm it.

54.    Plaintiff exited Genesis's bedroom and shut her door.  When the door was shut, Plaintiff (out of frustration) hit the outside of the door with the side of his hand. Plaintiff is informed and believes that the loud noise scared Genesis.

55.    Plaintiff commenced watching a Los Angeles Dodger's game on the television.

56.    At some point, before the 7th inning of the baseball game, Victoria returned to the apartment and went into her bedroom.

57.    Plaintiff is informed and believes and thereon alleges that, when Victoria returned to the apartment, she talked to Genesis and called the police.

58.    During the 7th inning of the baseball game, Plaintiff went outside the front doorway to smoke a cigarette.

59.    Plaintiff was wearing only shorts (no shirt), and there was nothing in his pockets.  There were no bulges in his shorts.

60.    While standing in the doorway of his apartment, approximately two hours after his conversation with Genesis, Plaintiff observed four police officers from the San Bernardino Police Department, Defendant DOES 1-4, arriving at his apartment complex.  Plaintiff did not feel threatened because the officers looked like *Keystone Cops* and appeared confused.

61.    DOES 1-4 knew that Plaintiff suffers from schizophrenia, bipolar disorder, and post-traumatic stress syndrome (PTSD) because these conditions are documented in Plaintiff's criminal record.

62.     All police officers in the State of California are required to be P.O.S.T. certified.  Training for dealing with mentally-ill individuals is mandatory and covered in P.O.S.T. Learning Domain 37.  P.O.S.T. LD 37 instructs police officers: "Do not threaten the individual with arrest or in any other manner" because "[t]hreats may create additional fright, stress, or potential aggression."  LD 37 (p. 4-16).

63.     Defendant officers DOES 1-4 arrived to Apartment 5 and initiated a causal conversation with Plaintiff.  Plaintiff was 4 or 5 feet inside the front door of Apartment 5 (leaning on a sofa armrest) and DOES 1-4 were outside.

64.     DOE 3 ultimately asked Plaintiff if "Daniel" was in.  Plaintiff responded that no "Daniel" lived in the apartment.  Then DOE 3 asked if "Jennifer" was in.  Plaintiff responded that no "Jennifer" lived in the apartment.

65.     Then DOE 3 responded, "We're coming in."

66.     Plaintiff responded that, "You are not coming in without a warrant."

67.     DOE 3 yelled, "Take your hands out of your pockets."

68.     Plaintiff's hands were not in his pockets and there was obviously nothing in his pockets.

69.     Almost simultaneous with Plaintiff stating, "You are not coming in without a warrant," and DOE 3 yelling, "Take your hands out of your pockets," DOES 1-3 charged into the apartment, grabbed Plaintiff, dragged him outside the apartment, threw him up against the exterior wall of the apartment building, and twisted his arms behind his back.  Plaintiff loudly objected to the unconstitutional seizure and excessive force.

70.     DOES 1-3 arrested Plaintiff for resisting arrest (*Penal Code* § 69(a)).  DOE 1 handcuffed Plaintiff with his hands behind his back and sat Plaintiff on the outdoor stairs near Apartment 5.

71.     Defendants had no probable cause to believe that Plaintiff had committed a crime or intended to commit a crime.

72.     In arresting Plaintiff without probable cause, Defendant DOES 1-3 acted under color of state law.

73.    In arresting Plaintiff without probable cause, Defendant DOES 1-3 acted intentionally, maliciously, and oppressively to cause Plaintiff pain, suffering, and emotional distress.

74.    Defendant DOES 1-3 were motivated by evil motive.

75.    Defendants' seizure of Plaintiff's person was unreasonable and deprived Plaintiff of his Fourth Amendment right to be free of unreasonable seizures.

76.    The acts of DOES 1-3 were the proximate cause and moving force in the deprivation of Plaintiff's Fourth Amendment right to be free from unreasonable seizures.

## II.

## SECOND CAUSE OF ACTION

## VIOLATION OF FOURTH AMENDMENT—EXCESSIVE FORCE

### [42 U.S.C. § 1983]

(By Plaintiff Against DOES 1-3)

77.    Plaintiff incorporates by reference the allegations contained in paragraphs 1-5 and 9-47 as though fully set forth herein.

78.    On April 18, 2022, Plaintiff was in his apartment located at 2641 West 2nd Street, Apartment 5, San Bernardino, California 92410 with his step-granddaughter (Genesis) (age 14).

79.    Plaintiff lived in the apartment with his wife (Victoria) and Genesis.

80.    Victoria was not at home, and Plaintiff believed that she was out with her male friend.

81.    Plaintiff asked Genesis where her grandmother (Victoria) was.  (Genesis was in her bedroom.) Genesis denied that she knew where Victoria was, and Plaintiff did not believe her.

82.    Plaintiff was perturbed that Victoria was (again) out with another man, and that Genesis would not confirm it.

83.    Plaintiff exited Genesis's bedroom and shut her door.  When the door was shut, Plaintiff (out of frustration) hit the outside of the door with the side of his hand. Plaintiff is informed and believes that the loud noise scared Genesis.

84.    Plaintiff commenced watching a Los Angeles Dodger's game on the television.

85.    At some point, before the 7th inning of the baseball game, Victoria returned to the apartment and went into her bedroom.

86.    Plaintiff is informed and believes and thereon alleges that, when Victoria returned to the apartment, she talked to Genesis and called the police.

87.    During the 7th inning of the baseball game, Plaintiff went outside the front doorway to smoke a cigarette.

88.    Plaintiff was wearing only shorts (no shirt), and there was nothing in his pockets.  There were no bulges in his shorts.

89.    While standing in the doorway of his apartment, approximately two hours after his conversation with Genesis, Plaintiff observed four police officers from the San Bernardino Police Department, Defendant DOES 1-4, arriving at his apartment complex.  Plaintiff did not feel threatened because the officers looked like *Keystone Cops* and appeared confused.

90.    DOES 1-4 knew that Plaintiff suffers from schizophrenia, bipolar disorder, and post-traumatic stress syndrome (PTSD) because these conditions are documented in Plaintiff's criminal record.

91.    All police officers in the State of California are required to be P.O.S.T. certified.  Training for dealing with mentally-ill individuals is mandatory and covered in P.O.S.T. Learning Domain 37.  P.O.S.T. LD 37 instructs police officers: "Do not threaten the individual with arrest or in any other manner" because "[t]hreats may create additional fright, stress, or potential aggression."  LD 37 (p. 4-16).

92.     Defendant officers DOES 1-4 arrived to Apartment 5 and initiated a casual
conversation with Plaintiff.  Plaintiff was 4 or 5 feet inside the front door of Apartment
5 (leaning on a sofa armrest) and DOES 1-4 were outside.

93.     DOE 3 ultimately asked Plaintiff if "Daniel" was in.  Plaintiff responded
that no "Daniel" lived in the apartment.  Then DOE 3 asked if "Jennifer" was in.
Plaintiff responded that no "Jennifer" lived in the apartment.

94.     Then DOE 3 responded, "We're coming in."

95.     Plaintiff responded that, "You are not coming in without a warrant."

96.     DOE 3 yelled, "Take your hands out of your pockets."

97.     Plaintiff's hands were not in his pockets and there was obviously nothing in
his pockets.

98.     Almost simultaneous with Plaintiff stating, "You are not coming in without
a warrant," and DOE 3 yelling, "Take your hands out of your pockets," DOES 1-3
charged into the apartment, grabbed Plaintiff, dragged him outside the apartment, threw
him up against the exterior wall of the apartment building, and twisted his arms behind
his back.  Plaintiff loudly objected to the unconstitutional seizure and excessive force.

99.     DOES 1-3 arrested Plaintiff for resisting arrest (*Penal Code* § 69(a)).  DOE
1 handcuffed Plaintiff with his hands behind his back and sat Plaintiff on the outdoor
stairs near Apartment 5.

100.    Plaintiff continued to voice loud objections to DOE 1 and 2's excessive
force and arrest without probable cause.

101.    DOE 1 grabbed Plaintiff by the left arm, stood him up, and then threw him
down on the concrete walkway (face down).

102.    As a result of the impact on the sidewalk, Plaintiff suffered three broken
ribs, a fractured elbow, and a collapsed lung.

103.    DOE 1 put his knee on Plaintiff's back to hold him down while DOE 2
held Plaintiff's head down in the dirt next to the walkway.  Plaintiff had great difficulty
breathing.

104.   Officer DOES 1 and 2 took Plaintiff to Arrowhead for examination and treatment. A nurse measured Plaintiff's blood pressure and temperature and discharged him. No treatment was provided.

105.   Following the examination, Officers DOES 1 and 2 took Plaintiff to the Central Detention Center in San Bernardino. The County isolated Plaintiff pursuant to its policies for holding inmates with mental illness. Plaintiff laid on the floor for a day or so because he could not breathe.

106.   On or about April 19, 2022, Plaintiff was transferred to the WVDC in Rancho Cucamonga. The County isolated Plaintiff pursuant to its policies for holding inmates with mental illness. Plaintiff laid on the floor for a day or so because he could not breathe.

107.   Plaintiff spent approximately three days in isolation lying on the floor with three broken ribs, a fractured elbow, and a collapsed lung.

108.   Finally, on or about April 21, 2022, a female custody officer found Plaintiff lying on the floor and asked if he was all right. Plaintiff responded that he could not breathe.

109.   The female custody officer took Plaintiff to Arrowhead for another examination.

110.   X-rays revealed a collapsed lung, three broken ribs, and a fractured elbow. Plaintiff underwent surgery to inflate his lung and to treat his fractures. Plaintiff was discharged from Arrowhead on or about April 22, 2022.

111.   Defendants had no probable cause to believe that Plaintiff had committed a crime or intended to commit a crime.

112.   In beating Plaintiff, Defendant DOES 1-3 acted under color of law.

113.   In beating Plaintiff, Defendant DOES 1-3 acted intentionally, maliciously, and oppressively to cause Plaintiff pain, suffering, and emotional distress.

114.   Defendant DOES 1-3 were motivated by evil motive.

115.   Defendants' seizure to Plaintiff's person was unreasonable and deprived Plaintiff of his Fourth Amendment right to be free of unreasonable seizures.

116.   The acts of Defendant DOES 1-3 were the proximate cause and moving force in the deprivation of Plaintiff's Fourth Amendment rights.

## III.

## THIRD CAUSE OF ACTION

## <u>MONELL</u>

### [42 U.S.C. § 1983]

(By Plaintiff Against CITY)

117.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-5 and 9-47 as though fully set forth herein.

118.   On April 18, 2022, Plaintiff was in his apartment located at 2641 West 2nd Street, Apartment 5, San Bernardino, California 92410 with his step-granddaughter (Genesis) (age 14).

119.   Plaintiff lived in the apartment with his wife (Victoria) and Genesis.

120.   Victoria was not at home, and Plaintiff believed that she was out with her male friend.

121.   Plaintiff asked Genesis where her grandmother (Victoria) was.  (Genesis was in her bedroom.) Genesis denied that she knew where Victoria was, and Plaintiff did not believe her.

122.   Plaintiff was perturbed that Victoria was (again) out with another man, and that Genesis would not confirm it.

123.   Plaintiff exited Genesis's bedroom and shut her door.  When the door was shut, Plaintiff (out of frustration) hit the outside of the door with the side of his hand. Plaintiff is informed and believes that the loud noise scared Genesis.

124.   Plaintiff commenced watching a Los Angeles Dodger's game on the television.

1      125.   At some point, before the 7th inning of the baseball game, Victoria

2  returned to the apartment and went into her bedroom.

3      126.   Plaintiff is informed and believes and thereon alleges that, when Victoria

4  returned to the apartment, she talked to Genesis and called the police.

5      127.   During the 7th inning of the baseball game, Plaintiff went outside the front

6  doorway to smoke a cigarette.

7      128.   Plaintiff was wearing only shorts (no shirt), and there was nothing in his

8  pockets.  There were no bulges in his shorts.

9      129.   While standing in the doorway of his apartment, approximately two hours

10  after his conversation with Genesis, Plaintiff observed four police officers from the San

11  Bernardino Police Department, Defendant DOES 1-4, arriving at his apartment

12  complex.  Plaintiff did not feel threatened because the officers looked like *Keystone*

13  *Cops* and appeared confused.

14      130.   DOES 1-4 knew that Plaintiff suffers from schizophrenia, bipolar disorder,

15  and post-traumatic stress syndrome (PTSD) because these conditions are documented in

16  Plaintiff's criminal record.

17      131.   All police officers in the State of California are required to be P.O.S.T.

18  certified.  Training for dealing with mentally-ill individuals is mandatory and covered in

19  P.O.S.T. Learning Domain 37.  P.O.S.T. LD 37 instructs police officers: "Do not

20  threaten the individual with arrest or in any other manner" because "[t]hreats may create

21  additional fright, stress, or potential aggression."  LD 37 (p. 4-16).

22      132.   Defendant officers DOES 1-4 arrived to Apartment 5 and initiated a causal

23  conversation with Plaintiff.  Plaintiff was 4 or 5 feet inside the front door of Apartment

24  5 (leaning on a sofa armrest) and DOES 1-4 were outside.

25      133.   DOE 3 ultimately asked Plaintiff if "Daniel" was in.  Plaintiff responded

26  that no "Daniel" lived in the apartment.  Then DOE 3 asked if "Jennifer" was in.

27  Plaintiff responded that no "Jennifer" lived in the apartment.

28      134.   Then DOE 3 responded, "We're coming in."

135.   Plaintiff responded that, "You are not coming in without a warrant."

136.   DOE 3 yelled, "Take your hands out of your pockets."

137.   Plaintiff's hands were not in his pockets and there was obviously nothing in his pockets.

138.   Almost simultaneous with Plaintiff stating, "You are not coming in without a warrant," and DOE 3 yelling, "Take your hands out of your pockets," DOES 1-3 charged into the apartment, grabbed Plaintiff, dragged him outside the apartment, threw him up against the exterior wall of the apartment building, and twisted his arms behind his back.  Plaintiff loudly objected to the unconstitutional seizure and excessive force.

139.   DOES 1-3 arrested Plaintiff for resisting arrest (*Penal Code* § 69(a)).  DOE 1 handcuffed Plaintiff with his hands behind his back and sat Plaintiff on the outdoor stairs near Apartment 5.

140.   Plaintiff continued to voice loud objections to DOE 1 and 2's excessive force and arrest without probable cause.

141.   DOE 1 grabbed Plaintiff by the left arm, stood him up, and then threw him down on the concrete walkway (face down).

142.   As a result of the impact on the sidewalk, Plaintiff suffered three broken ribs, a fractured elbow, and a collapsed lung.

143.   DOE 1 put his knee on Plaintiff's back to hold him down while DOE 2 held Plaintiff's head down in the dirt next to the walkway.  Plaintiff had great difficulty breathing.

144.   Officer DOES 1 and 2 took Plaintiff to Arrowhead for examination and treatment.  A nurse measured Plaintiff's blood pressure and temperature and discharged him. No treatment was provided.

145.   Following the examination, Officers DOES 1 and 2 took Plaintiff to the Central Detention Center in San Bernardino. The County isolated Plaintiff pursuant to its policies for holding inmates with mental illness. Plaintiff laid on the floor for a day or so because he could not breathe.

146.   On or about April 19, 2022, Plaintiff was transferred to the WVDC in Rancho Cucamonga.  The County isolated Plaintiff pursuant to its policies for holding inmates with mental illness. Plaintiff laid on the floor for a day or so because he could not breathe.

147.   Plaintiff spent approximately three days in isolation lying on the floor with three broken ribs, a fractured elbow, and a collapsed lung.

148.   Finally, on or about April 21, 2022, a female custody officer found Plaintiff lying on the floor and asked if he was all right.  Plaintiff responded that he could not breathe.

149.   The female custody officer took Plaintiff to Arrowhead for another examination.

150.   X-rays revealed a collapsed lung, three broken ribs, and a fractured elbow. Plaintiff underwent surgery to inflate his lung and to treat his fractures.  Plaintiff was discharged from Arrowhead on or about April 22, 2022.

151.   In beating Plaintiff, Defendant DOES 1-3 acted under color of law.

152.   Defendants' seizure of Plaintiff's person was unreasonable and deprived Plaintiff of his Fourth Amendment right to be free of unreasonable seizures.

153.   In beating Plaintiff and depriving Plaintiff of his right to be free from unreasonable seizures, Defendant DOES 1-3 acted pursuant to the longstanding practice or custom of the San Bernardino Police Department ("SBPD") to condone violence and excessive force.

154.   Plaintiff is informed and believes and thereon alleges that the unjustified beating of Plaintiff was found to be consistent with SBPD policy, practice, and custom.

155.   Plaintiff is informed and believes and thereon alleges that Defendant DOES 1-3 were not disciplined for their unjustified beating of Plaintiff.

156.   Plaintiff is informed and believes and thereon alleges that SBPD employs and retains officers who it knows have dangerous propensities for abusing their authorities and mistreating citizens.

157. Plaintiff is informed and believes and thereon alleges that SBPD maintains grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling officers' use of excessive force.

158. Plaintiff is informed and believes and thereon alleges that SBPD policy is to not investigate claims of excessive force.

159. Plaintiff is informed and believes and thereon alleges that SBPD policy is to not discipline officers accused of using excessive force.

160. The CITY's longstanding practice or custom of condoning violence and excessive force was the proximate cause and moving force in the deprivation of Plaintiff's Fourth Amendment right to be free from unreasonable seizures.

## IV.

## FOURTH CAUSE OF ACTION

## RALPH ACT

## [California Civil Code § 51.7]

(By Plaintiff Against CITY and DOES 1-3)

161. Plaintiff incorporates by reference the allegations contained in paragraphs 1-47 as though fully set forth herein.

162. On April 18, 2022, Plaintiff was in his apartment located at 2641 West 2nd Street, Apartment 5, San Bernardino, California 92410 with his step-granddaughter (Genesis) (age 14).

163. Plaintiff lived in the apartment with his wife (Victoria) and Genesis.

164. Victoria was not at home, and Plaintiff believed that she was out with her male friend.

165. Plaintiff asked Genesis where her grandmother (Victoria) was. (Genesis was in her bedroom.) Genesis denied that she knew where Victoria was, and Plaintiff did not believe her.

166. Plaintiff was perturbed that Victoria was (again) out with another man, and that Genesis would not confirm it.

167.   Plaintiff exited Genesis's bedroom and shut her door.  When the door was shut, Plaintiff (out of frustration) hit the outside of the door with the side of his hand. Plaintiff is informed and believes that the loud noise scared Genesis.

168.   Plaintiff commenced watching a Los Angeles Dodger's game on the television.

169.   At some point, before the 7th inning of the baseball game, Victoria returned to the apartment and went into her bedroom.

170.   Plaintiff is informed and believes and thereon alleges that, when Victoria returned to the apartment, she talked to Genesis and called the police.

171.   During the 7th inning of the baseball game, Plaintiff went outside the front doorway to smoke a cigarette.

172.   Plaintiff was wearing only shorts (no shirt), and there was nothing in his pockets.  There were no bulges in his shorts.

173.   While standing in the doorway of his apartment, approximately two hours after his conversation with Genesis, Plaintiff observed four police officers from the San Bernardino Police Department, Defendant DOES 1-4, arriving at his apartment complex.  Plaintiff did not feel threatened because the officers looked like *Keystone Cops* and appeared confused.

174.   DOES 1-4 knew that Plaintiff suffers from schizophrenia, bipolar disorder, and post-traumatic stress syndrome (PTSD) because these conditions are documented in Plaintiff's criminal record.

175.   All police officers in the State of California are required to be P.O.S.T. certified.  Training for dealing with mentally-ill individuals is mandatory and covered in P.O.S.T. Learning Domain 37.  P.O.S.T. LD 37 instructs police officers: "Do not threaten the individual with arrest or in any other manner" because "[t]hreats may create additional fright, stress, or potential aggression." LD 37 (p. 4-16).

176.   Defendant officers DOES 1-4 arrived to Apartment 5 and initiated a causal conversation with Plaintiff.  Plaintiff was 4 or 5 feet inside the front door of Apartment 5 (leaning on a sofa armrest) and DOES 1-4 were outside.

177.   DOE 3 ultimately asked Plaintiff if "Daniel" was in.  Plaintiff responded that no "Daniel" lived in the apartment.  Then DOE 3 asked if "Jennifer" was in. Plaintiff responded that no "Jennifer" lived in the apartment.

178.   Then DOE 3 responded, "We're coming in."

179.   Plaintiff responded that, "You are not coming in without a warrant."

180.   DOE 3 yelled, "Take your hands out of your pockets."

181.   Plaintiff's hands were not in his pockets and there was obviously nothing in his pockets.

182.   Almost simultaneous with Plaintiff stating, "You are not coming in without a warrant," and DOE 3 yelling, "Take your hands out of your pockets," DOES 1-3 charged into the apartment, grabbed Plaintiff, dragged him outside the apartment, threw him up against the exterior wall of the apartment building, and twisted his arms behind his back.  Plaintiff loudly objected to the unconstitutional seizure and excessive force.

183.   DOES 1-3 arrested Plaintiff for resisting arrest (*Penal Code* § 69(a)).  DOE 1 handcuffed Plaintiff with his hands behind his back and sat Plaintiff on the outdoor stairs near Apartment 5.

184.   Plaintiff continued to voice loud objections to DOE 1 and 2's excessive force and arrest without probable cause.

185.   DOE 1 grabbed Plaintiff by the left arm, stood him up, and then threw him down on the concrete walkway (face down).

186.   As a result of the impact on the sidewalk, Plaintiff suffered three broken ribs, a fractured elbow, and a collapsed lung.

187.   DOE 1 put his knee on Plaintiff's back to hold him down while DOE 2 held Plaintiff's head down in the dirt next to the walkway.  Plaintiff had great difficulty breathing.

188.   Officer DOES 1 and 2 took Plaintiff to Arrowhead for examination and treatment.  A nurse measured Plaintiff's blood pressure and temperature and discharged him. No treatment was provided.

189.   Following the examination, Officers DOES 1 and 2 took Plaintiff to the Central Detention Center in San Bernardino. The County isolated Plaintiff pursuant to its policies for holding inmates with mental illness. Plaintiff laid on the floor for a day or so because he could not breathe.

190.   On or about April 19, 2022, Plaintiff was transferred to the WVDC in Rancho Cucamonga.  The County isolated Plaintiff pursuant to its policies for holding inmates with mental illness. Plaintiff laid on the floor for a day or so because he could not breathe.

191.   Plaintiff spent approximately three days in isolation lying on the floor with three broken ribs, a fractured elbow, and a collapsed lung.

192.   Finally, on or about April 21, 2022, a female custody officer found Plaintiff lying on the floor and asked if he was all right.  Plaintiff responded that he could not breathe.

193.   The female custody officer took Plaintiff to Arrowhead for another examination.

194.   X-rays revealed a collapsed lung, three broken ribs, and a fractured elbow. Plaintiff underwent surgery to inflate his lung and to treat his fractures.  Plaintiff was discharged from Arrowhead on or about April 22, 2022.

195.   Plaintiff suffered three broken ribs, a fractured elbow, and a collapsed lung as a proximate result of Defendant DOES 1-3's conduct.

196.   A substantial motivating reason for the conduct of DOES 1-3 was their perception that Plaintiff is Hispanic.

///

///

# V.

## FIFTH CAUSE OF ACTION

## <u>BATTERY BY LAW-ENFORCEMENT OFFICER</u>

(By Plaintiff Against CITY and DOES 1-3)

197.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-47 as though fully set forth herein.

198.   On April 18, 2022, Plaintiff was in his apartment located at 2641 West 2nd Street, Apartment 5, San Bernardino, California 92410 with his step-granddaughter (Genesis) (age 14).

199.   Plaintiff lived in the apartment with his wife (Victoria) and Genesis.

200.   Victoria was not at home, and Plaintiff believed that she was out with her male friend.

201.   Plaintiff asked Genesis where her grandmother (Victoria) was.  (Genesis was in her bedroom.) Genesis denied that she knew where Victoria was, and Plaintiff did not believe her.

202.   Plaintiff was perturbed that Victoria was (again) out with another man, and that Genesis would not confirm it.

203.   Plaintiff exited Genesis's bedroom and shut her door.  When the door was shut, Plaintiff (out of frustration) hit the outside of the door with the side of his hand. Plaintiff is informed and believes that the loud noise scared Genesis.

204.   Plaintiff commenced watching a Los Angeles Dodger's game on the television.

205.   At some point, before the 7th inning of the baseball game, Victoria returned to the apartment and went into her bedroom.

206.   Plaintiff is informed and believes and thereon alleges that, when Victoria returned to the apartment, she talked to Genesis and called the police.

207.   During the 7th inning of the baseball game, Plaintiff went outside the front doorway to smoke a cigarette.

208.   Plaintiff was wearing only shorts (no shirt), and there was nothing in his pockets.  There were no bulges in his shorts.

209.   While standing in the doorway of his apartment, approximately two hours after his conversation with Genesis, Plaintiff observed four police officers from the San Bernardino Police Department, Defendant DOES 1-4, arriving at his apartment complex.  Plaintiff did not feel threatened because the officers looked like *Keystone Cops* and appeared confused.

210.   DOES 1-4 knew that Plaintiff suffers from schizophrenia, bipolar disorder, and post-traumatic stress syndrome (PTSD) because these conditions are documented in Plaintiff's criminal record.

211.   All police officers in the State of California are required to be P.O.S.T. certified.  Training for dealing with mentally-ill individuals is mandatory and covered in P.O.S.T. Learning Domain 37.  P.O.S.T. LD 37 instructs police officers: "Do not threaten the individual with arrest or in any other manner" because "[t]hreats may create additional fright, stress, or potential aggression."  LD 37 (p. 4-16).

212.   Defendant officers DOES 1-4 arrived to Apartment 5 and initiated a causal conversation with Plaintiff.  Plaintiff was 4 or 5 feet inside the front door of Apartment 5 (leaning on a sofa armrest) and DOES 1-4 were outside.

213.   DOE 3 ultimately asked Plaintiff if "Daniel" was in.  Plaintiff responded that no "Daniel" lived in the apartment.  Then DOE 3 asked if "Jennifer" was in. Plaintiff responded that no "Jennifer" lived in the apartment.

214.   Then DOE 3 responded, "We're coming in."

215.   Plaintiff responded that, "You are not coming in without a warrant."

216.   DOE 3 yelled, "Take your hands out of your pockets."

217.   Plaintiff's hands were not in his pockets and there was obviously nothing in his pockets.

218.   Almost simultaneous with Plaintiff stating, "You are not coming in without a warrant," and DOE 3 yelling, "Take your hands out of your pockets," DOES 1-3

charged into the apartment, grabbed Plaintiff, dragged him outside the apartment, threw him up against the exterior wall of the apartment building, and twisted his arms behind his back. Plaintiff loudly objected to the unconstitutional seizure and excessive force.

219.  DOES 1-3 arrested Plaintiff for resisting arrest (*Penal Code* § 69(a)). DOE 1 handcuffed Plaintiff with his hands behind his back and sat Plaintiff on the outdoor stairs near Apartment 5.

220.  Defendant DOES 1-3 used unreasonable force on Plaintiff.

221.  Plaintiff did not consent to the use of that force.

222.  Plaintiff loudly objected to the excessive force.

223.  DOES 1-3 arrested Plaintiff for resisting arrest (*Penal Code* § 69(a)), handcuffed Plaintiff with his hands behind his back, and sat Plaintiff on the outdoor stairs near Apartment 5.

224.  Plaintiff continued to voice loud objections to DOE 1-3's excessive force and arrest without probable cause.

225.  DOE 1 intentionally grabbed Plaintiff by the left arm, stood him up, and then threw him down on the concrete walkway (face down).

226.  DOE 1 used unreasonable force on Plaintiff.

227.  Plaintiff did not consent to DOE 1's use of force.

228.  Plaintiff suffered three broken ribs, a fractured elbow, and a collapsed lung as a proximate result of Defendant DOES 1-3's conduct.

THEREFORE, Plaintiff prays for judgment against Defendants as follows:

**ON THE FIRST CAUSE OF ACTION [42 U.S.C. § 1983 (Unreasonable Seizure)]**

1.  For general and special damages;

2.  For compensatory damages for lost earnings, loss of future earnings, and loss of earning capacity;

3.  For exemplary and punitive damages;

4.  For attorney fees pursuant to 42 U.S.C. § 1988;

5.  For costs of suit; and

6.     For such other and further relief as the court may deem proper.

**ON THE SECOND CAUSE OF ACTION [42 U.S.C. § 1983 (Excessive Force)**

7.     For general and special damages;

8.     For compensatory damages for lost earnings, loss of future earnings, and loss of earning capacity;

9.     For exemplary and punitive damages;

10.     For attorney fees pursuant to 42 U.S.C. § 1988;

11.     For costs of suit; and

12.     For such other and further relief as the court may deem proper.

**ON THE THIRD CAUSE OF ACTION [42 U.S.C. § 1983 (Monell)**

13.     For general and special damages;

14.     For compensatory damages for lost earnings, loss of future earnings, and loss of earning capacity;

15.     For attorney fees pursuant to 42 U.S.C. § 1988;

16.     For costs of suit; and

17.     For such other and further relief as the court may deem proper.

**ON THE FOURTH CAUSE OF ACTION [Civil Code § 51.7 (Ralph Act)]**

18.     For general and civil damages:

19.     For a civil penalty in the sum of $25,000 pursuant to *Civil Code* § 52(b)(2);

20.     For exemplary and punitive damages;

21.     For attorney fees pursuant to *Civil Code* § 52(b)(3);

22.     For costs of suit; and

23.     For such other and further relief as the court may deem proper.

**ON THE FIFTH CAUSE OF ACTION [Battery by law-enforcement officer]**

24.     For general and special damages;

25.     For exemplary and punitive damages;

26.     For costs of suit; and

27.     For such other and further relief as the court may deem proper.

1

2

3

4   Dated: May 22, 2023

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SKAPIK LAW GROUP


By: _____

Mark J. Skapik
Attorneys for Plaintiff
DAMON "DAVID" WOODS

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury.


SKAPIK LAW GROUP


Dated: May 22, 2023                    By:

Mark J. Skapik
Attorneys for Plaintiff
DAMON "DAVID" WOODS